# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**DENNIS F. CANTRELL**
Cantrell, Strenski & Mehringer, LLP
Indianapolis, Indiana

**JAN N. CAMPBELL**
**GENE R. LEEUW**
**JEFFREY R. OBERLIES**
**MATTHEW G. BUTCHER**
Leeuw Oberlies & Campbell, P.C.
Indianapolis, Indiana

**KARL L. MULVANEY**
**NANA QUAY-SMITH**
**SHANNON D. LANDRETH**
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

**DAVID P. SANDERS**
Jenner & Block, LLP
Chicago, Illinois

ATTORNEYS FOR APPELLEES:

**JULIA BLACKWELL GELINAS**
**MAGGIE L. SMITH**
Frost Brown Todd, LLC
Indianapolis, Indiana

**WILLIAM N. RILEY**
**JOSEPH N. WILLIAMS**
**JAMES A. PIATT**
Price Waicukauski & Riley, LLC
Indianapolis, Indiana

**J. MARK McKINZIE**
Riley Bennett & Egloff, LLP
Indianapolis, Indiana



FILED
Apr 11 2013, 9:32 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 29A04-1111-CT-571 |
| | ) | |
| JOSEPH MARTIN RADCLIFF and COASTAL PROPERTY MANAGEMENT LLC, a/k/a CPM CONSTRUCTION OF INDIANA, | ) | |

    )
    )
    )

---

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Steven R. Nation, Judge
Cause No. 29D01-0810-CT-1281

---

**April 11, 2013**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

In April 2006, central Indiana suffered a large hailstorm. Joseph Radcliff formed a company to repair the storm-damaged homes. State Farm Fire & Casualty Company began denying many of its policyholders' claims even though other insurance companies were paying similar claims. Radcliff and his company offered to help the State Farm policyholders. Amid a flurry of bad publicity about State Farm's claims response which in part was generated by Radcliff, State Farm launched an insurance-fraud investigation into Radcliff and his company. Radcliff was arrested on fourteen felony counts, but the charges were eventually dismissed pursuant to a diversion agreement with the State. State Farm then sued Radcliff and CPM for fraud and racketeering; Radcliff and his company counterclaimed for, among other things, defamation.

Following a nearly six-week-long jury trial before the Honorable Steven Nation in which over forty witnesses testified, a jury returned a $14.5 million verdict in favor of Radcliff and his company on their defamation counterclaim. This is one of the largest

2

defamation verdicts in United States history. State Farm now appeals arguing that (1) it is entitled to judgment on Radcliff's defamation counterclaim pursuant to two defenses: the public interest privilege for crime reporting and statutory immunity; (2) Radcliff failed to prove actual malice by clear and convincing evidence; and (3) it is entitled to a new trial on damages. Utilizing our standard of review for judgments on the evidence, we conclude looking to the evidence most favorable to Radcliff that State Farm is not entitled to judgment on either of the defenses. Also, utilizing a heightened standard of review for defamation cases, after an independent review of the record, we uphold the jury's verdict that Radcliff proved actual malice by clear and convincing evidence and conclude that State Farm is not entitled to a new trial on damages. We therefore affirm the trial court.

**Facts and Procedural History**

A. *The Good Friday 2006 Hailstorm and State Farm's Handling of the Ensuing Claims*

On Good Friday, April 14, 2006, central Indiana suffered a large hailstorm that caused millions of dollars in property damage, generating almost 50,000 State Farm claims. State Farm's handling of these hailstorm claims led to the events in this case.

After the hailstorm, the Indiana Department of Insurance received 425 complaints from State Farm policyholders, and in March 2007, the Department of Insurance initiated a "Market Conduct Examination."[1] CPM Ex. 178. The Market Conduct Examination

---

[1] According to the Department of Insurance's website, it:

performs market conduct examinations of insurance companies and other licensed entities to determine whether they are in compliance with contract provisions and state laws, rules, and regulations. . . . If the commissioner determines that regulatory action is

3

revealed "areas of concern" regarding State Farm's handling of the claims in the wake of the hailstorm. *Id.* At about the same time, a class-action lawsuit was filed on behalf of more than 7000 State Farm policyholders whose hail claims had been denied. During the same time, Indianapolis's rtv6 Call 6 investigative reporter Rafael Sanchez televised reports about State Farm's refusal to pay claims related to the hailstorm and reported the backlash against State Farm from its policyholders. Tr. p. 4054. As the pressures grew, State Farm became concerned with the public's perception of its image.

### B. Radcliff Creates CPM to Repair Hail-damaged Homes

Several months after the storm, Radcliff created Coastal Property Management LLC (CPM) to repair the storm-damaged homes. Although headquartered in Indiana, CPM had offices in Ohio and Missouri and nearly 400 workers. *Id.* at 4014-15.

Radcliff was retained by approximately 300 State Farm policyholders whose claims had been denied. *Id.* at 4023. By late 2006, Radcliff saw other insurance companies approving claims when the homeowners next door—insured by State Farm— had their claims denied. *Id.* at 4023-26.

Radcliff took his clients' concerns to the Department of Insurance, where he learned that State Farm was already being investigated for unfair-claims practices. *Id.* at 4023-24, 4026-28. The Department of Insurance asked Radcliff for evidence in its investigation of State Farm. *Id.* at 4028.

---

appropriate as a result of an examination, the commissioner may initiate any proceeding or action authorized by law.

Ind. Dep't of Ins., *Market Conduct*, http://www.in.gov/idoi/2615.htm (last visited Apr. 1, 2013).

An agreement was eventually reached between the parties to resolve all issues concerning the Market Conduct Examination. CPM Ex. 178.

Around this same time, Radcliff contacted Rafael Sanchez with rtv6 because he had seen a story on the news about State Farm and the April 2006 hailstorm. *Id.* at 4054. Rafael Sanchez interviewed Radcliff at his office.

Radcliff learned that many roofing contractors were unwilling to work with homeowners who had State Farm for their insurance company because of the claims-denial issue. *Id.* at 4056. In fact, contractors put advertisements in the newspaper discouraging State Farm policyholders from calling them. *Id.* Radcliff, however, wanted to "let people know that there was somebody that would help them" and posted signs in and around Marion County stating that CPM would "fight State Farm." *Id.* at 4055-56; CPM Ex. 60. State Farm complained about these signs. Tr. p. 4056.

### C. The State Farm Players

Tom Cockerill and Karl Benz are the State Farm employees who allegedly defamed Radcliff and CPM by forwarding their insurance-fraud investigation to the National Insurance Crime Bureau (NICB), which is a not-for-profit organization that acts as a liaison between insurers and law enforcement. The NICB turned over its investigation to the Indianapolis Metropolitan Police Department (IMPD), and a probable-cause affidavit was prepared, which both Cockerill and Benz reviewed for accuracy. Cockerill and Benz work in State Farm's Special Investigative Unit (SIU), which investigates insurance claims involving indications of fraud referred by adjusters. Benz has twenty-three years' experience in the SIU as a certified insurance fraud investigator and certified fraud examiner and is the SIU's Team Manager. *Id.* at 3557-59.

5

Cockerill is a certified fraud examiner who reports to Benz and was the lead investigator in this case.

### D. State Farm's Public-Relations Strategy

Around February 2007, Angie Rinock, State Farm's media specialist for the Great Lakes Zone, learned that Radcliff was meeting with Rafael Sanchez as part of rtv6's ongoing inquiry into State Farm's practices. CPM Ex. 166. Rinock made a note to herself that there would be an investigation into Radcliff and CPM and that there were concerns about the "professional business ethics of this particular group." *Id.*

During this same time, Rinock and State Farm Regional Claims Manager Neil Fritze regularly exchanged emails regarding a public-relations strategy.[2] CPM Ex. 161, 163, 167. In March 2007, they received an internal email explaining that State Farm's attempts to defray the negative media attention had failed and "[u]nfortunately, th[e] story will not go away . . . . Our partners are requesting a change to a more aggressive strategy." Tr. p. 3721-22; CPM Ex. 171.

According to State Farm internal emails, rtv6 ran a story about State Farm on July 16, 2007. *See* CPM Ex. 154 ("Based on last night's Channel 6 story it appears Ra[f]ael has taken a softer tone regarding State Farm's handling of hail claims. What do you think about approaching Rafael to see if he would like to do a story on 'mechanical damage to roofs?'" (email dated July 17, 2007)). Rinock responded to this email on July 18 and said that when she had Rafael Sanchez visit the Indianapolis office, they discussed mechanical damage, but at this point in time she thought that it was best "to lay as low as

---

[2] The concerns went as high as the head of State Farm's corporate media relations. Tr. p. 3674-75.

possible in Indianapolis." *Id.* Benz, however, responded to Rinock's email that same day, explaining that "[s]ome of the negative press that has been occurring in Indy has been generated by . . . questionable contractors in efforts to put pressure on us to simply pay . . . questionable claims. A good, positive story to indirectly expose some of these practices and help protect consumers could go a long way to helping change the public's attitudes and perceptions." *Id.* When Benz wrote this email to Rinock, State Farm had already begun a formal investigation of Radcliff and CPM.

*E. State Farm Begins Formal Investigation of Radcliff and CPM*

Benz formally opened an investigation into Radcliff and CPM on June 29, 2007. Tr. p. 3480, 3533. Although State Farm says the decision came over a period of time, it was prompted by a single claim on Tom and Julie Moll's Indianapolis home. *Id.* at 3482.

State Farm adjusters found no hail damage when they first inspected the Molls' roof in May 2006. However, three of the Molls' immediate neighbors received new roofs and "at least" three or four other homes in the neighborhood also received new roofs. *Id.* at 3031. A year later, CPM obtained the Molls' signed power of attorney and asked State Farm to reopen the claim. Two State Farm adjusters inspected the Molls' roof with Radcliff on June 21, 2007. Afterwards, both adjusters told Benz that Radcliff became agitated when they did not find hail damage and intentionally creased roof shingles in the adjusters' presence, claiming he would have State Farm pay for the roof as wind damage. *Id.* at 3480-81. In the Molls' claim file is a photograph of someone creasing the shingles, but Radcliff says it is not his hand in the photograph. *Id.* at 3481-83. In defense of

Radcliff, Mrs. Moll testified at trial that State Farm's engineer bent back ten to fifteen of her shingles. *Id.* at 3029-30.

Benz assigned the Molls' claim to Cockerill for investigation. Cockerill took recorded statements from both adjusters and the Molls. Cockerill and Benz decided that an engineer should inspect the Molls' roof to determine the nature and origin of any damage. Cockerill retained Roofing Consultants.

In the meantime, Cockerill learned that Dwayne Van Bibber, a former CPM employee, was willing to talk to State Farm. Notably, Van Bibber did not testify at trial, so the following account of the interaction between Cockerill and Van Bibber came from Cockerill's testimony and Cockerill's notes of the conversations he had with Van Bibber.

Cockerill met with Van Bibber on July 16, 2007. Van Bibber told Cockerill that he was uncomfortable with CPM's practices. CPM employees would damage soft-metal surfaces, such as gutters, to obtain insurance payment for the entire roof. State Farm Ex. 130. Van Bibber explained that CPM employees would "prep" the roof before State Farm adjusters arrived by rubbing granules off the shingles to make potential hail damage look more obvious. *Id.* Van Bibber said that he witnessed Radcliff and other employees using coins to "prep" the roof by making potential hail damage look more obvious. *Id.*

Van Bibber then showed Cockerill a text message that Radcliff had allegedly sent to all Indiana CPM employees in which Radcliff said that he had spoken with State Farm, and State Farm was looking for "dime spin[n]ing." State Farm Ex. 129. If caught, State Farm would call the police. *Id.* Radcliff said in the text that the roof would come out of

8

their commissions and they would be fired to protect the company. *Id.* The text message allegedly ended, "Don't do it anymore. NO MORE DIME SPIN[N]ING." *Id.*

The text message produced at trial, however, did not come from Radcliff's phone. In the meeting, Cockerill asked Van Bibber to forward Radcliff's text message from Van Bibber's phone to Mike Abell's[3] cell phone, because Cockerill did not want Van Bibber to have his phone number. Abell then forwarded the text message to Cockerill's work cell phone. Cockerill forwarded the text message from his work cell phone to his personal cell phone. Finally, Cockerill forwarded the text message from his personal email to his work email so that he could print it off. *See* State Farm Ex. 131 (chain of custody from Van Bibber to Cockerill); Tr. p. 2484-2488. When Cockerill showed the text message on his phone at trial, it was in two parts. *Id.* at 2490. However, Cockerill said that when he saw it on Van Bibber's phone, it was one message. *Id.* Cockerill had no explanation for this discrepancy. *Id.*

Two other former CPM salespeople, Bill Stevens and Buzz Walters, later told Cockerill that they received the same text message from Radcliff. State Farm Ex. 133, 134. But only Walters testified at trial (via video deposition), Tr. p. 1475, and, as discussed at oral argument, he had credibility issues. Oral Arg. Video Tr. 36:06-16.

Radcliff admitted sending a text message to all of his Indiana CPM employees, but he claimed the substance was different than Cockerill claimed. Radcliff Dep., p. 322-23. According to Radcliff, his text message said that he had just talked to State Farm and they were accusing CPM of dime spinning. Radcliff then explained in his text message

---

[3] Mike Abell was an independent adjuster assigned to State Farm. Tr. p. 2258.

that if anyone was caught doing this, he would contact the police, they would be fired, and the roof would come out of their commissions. *Id.* at 323. Radcliff said his text message simply ended, "Do not do this. No more." *Id.*

On August 17, 2007, Roofing Consultants faxed the report on the Molls' home to Cockerill. Benz thought there were some inconsistencies in the report, so he consulted State Farm's attorney and then called Roofing Consultants to seek clarification. Tr. p. 3503. The final report, dated August 20, 2007, concluded that the marks on the Molls' roof were not consistent with hail. State Farm Ex. 49, p. 2-3. There was an entry to the Molls' claim log about Benz contacting Roofing Consultants to clarify its report, which Cockerill then marked out before turning over the claim log to the NICB. Tr. p. 2798-2803. Cockerill explained that he thought this particular entry was protected by the attorney-client privilege, because Benz had contacted State Farm's attorney, and this is why he marked it out. *Id.* Benz, however, conceded at trial that this particular entry was probably not protected by the attorney-client privilege, because it was "simply a discussion about the phone call [he] had with Roofing Consultants to seek a clarification on their report," and no one at Roofing Consultants was an attorney. *Id.* at 3509.

Based on Roofing Consultants' report, Cockerill and Benz decided that the damage to the roof was not accidental. Cockerill sent the report to the Molls and told them that their hail claim would be denied; however, they could file a vandalism claim and a police report against Radcliff in order to get a new roof.[4] *Id.* at 2509-10, 3033-34. Cockerill told the Molls that filing the claim as vandalism would help their State Farm

---

[4] Vandalism is covered under State Farm's policy. Tr. p. 2478.

10

claims-free discount. *Id.* at 3033. The Molls did not take State Farm up on its offer because they did not know whether their roof had been vandalized and they never witnessed anyone associated with CPM do any damage to their property.[5] *Id.* at 3034.

The report from Roofing Consultants convinced Cockerill and Benz to continue their investigation into Radcliff and CPM. Unconvinced that their roof had been vandalized, the Molls hired a certified home inspector, John Kidwell, to specifically look for vandalism. *Id.* at 3091-93. Kidwell issued a report finding storm damage. *Id.* at 3094-95. The Molls told Cockerill about Kidwell's report, but Cockerill never obtained Kidwell's report; as such, the report was never provided to the NICB.[6] An engineer on behalf of Radcliff inspected the roof and issued a report finding storm damage and no vandalism. *Id.* at 2789-90; CPM Ex. 49 (Lee Engineering). Cockerill claimed he never received the report, and this is why he never forwarded it to the NICB. Tr. p. 2791. Radcliff, however, claimed that he gave the report to State Farm. *Id.* at 4128.

### F. State Farm Investigates Nine More Claims

Cockerill and Benz's investigation continued with nine more hail-damage claims involving Radcliff and CPM as follows:

---

[5] When Mrs. Moll was asked at trial if she would have received a new roof if she would have simply followed Cockerill's direction to file a vandalism claim against Radcliff, which would have preserved their claims-free discount, she responded:

> That's what the State Farm reports that I have in writing and in conversation with Karl Benz and reply to my IDOI complaint and whatnot are that there's no disagreement on whether I need to have my roof replaced, it's whether it's due to storm damage or . . . vandalism. And I have two engineer reports saying storm damage and one saying both.

Tr. p. 3033.

[6] Benz apparently requested the report from the Molls during a phone interview, but he never received the report from them. Tr. p. 2508, 3513.

## 1. Trent Hinshaw

Before Radcliff's involvement with this claim, the State Farm adjuster noted that there was hail damage to Hinshaw's gutters, air-conditioning unit, and three tab shingles. *Id.* at 2814. But when the adjuster spoke with Cockerill, the adjuster said that the damage did not appear to be consistent with hail. *Id.* State Farm hired an engineer to inspect the roof, and this report did not identify vandalism. *Id.* at 2816-17. So, State Farm asked Hinshaw if a second engineer from the company could inspect the roof. This second report found intentional mechanical damage to Hinshaw's roof. *Id.* at 2818. Before the second report was issued, State Farm instructed Hinshaw to file a vandalism claim against Radcliff. *Id.*

## 2. William Stevens

State Farm inspected Stevens' home in May 2006 and found minor damage, but none to the roof. Before Radcliff's involvement, in March 2007, Stevens hired a contractor who found hail damage to the roof. Cockerill did not provide this estimate to the NICB.

An engineer on behalf of Radcliff issued a report finding storm damage and no vandalism to Stevens' roof. CPM Ex. 43 (Lee Engineering). Cockerill claimed he never received the report and this is why he never forwarded it to the NICB. Tr. p. 2765. Radcliff, however, claimed he gave this report to State Farm. *Id.* at 4128. State Farm had an engineer inspect the roof, and the engineer found intentional mechanical damage. *Id.* at 2762.

Stevens filed three complaints against State Farm with the Department of Insurance. The complaints alleged that State Farm harassed him, refused to pay for legitimate damage, and threatened to turn him over to the SIU unless he accused Radcliff of vandalism. *Id.* at 2765-72. Cockerill did not provide these complaints to the NICB. *Id.*

### 3. Larry and Martha Horn

After inspecting the Horns' roof with one of Radcliff's employees for nearly thirty minutes, State Farm's adjuster told Mr. Horn, "Mr. Horn, "I'm going to buy you a new roof. You have hail damage." *Id.* at 3245, 3233. Less than twenty-four hours later, however, the same State Farm adjuster got back on the Horns' roof along with Abell. *Id.* at 2339-40. During the re-inspection, Abell took out a coin and, using a shingle that was already damaged, showed the adjuster what coining looked like. The Horns were not told that State Farm had intentionally damaged some of their shingles for training purposes.

State Farm had an engineer inspect the roof, and the engineer found intentional mechanical damage. The engineer was also not told what State Farm had done to some of the shingles.

The Horns did not get their new roof as State Farm had promised. Instead, the Horns had to pay for their roof out of their retirement account. *Id.* at 3249.

### 4. Dan and Laura Pongratz

Four of the Pongratzes' immediate neighbors received new roofs because of the hailstorm, but not the Pongratzes. Before Radcliff's involvement, the Pongratzes hired a contractor who found storm damage to their entire roof. *Id.* at 2750-51. Cockerill did not

13

provide this report to the NICB. An engineer on behalf of Radcliff also issued a report finding storm damage and no vandalism. *Id.* at 2755-56; CPM Ex. 22 (Lee Engineering). Cockerill claimed he never received the report, and this is why he never forwarded it to the NICB. Tr. p. 2756. Radcliff, however, claimed that he gave the report to State Farm. *Id.* at 4128. State Farm hired an engineer who found intentional mechanical damage. *Id.* at 2753-54.

According to Mr. Pongratz, a State Farm representative told him that if he filed a vandalism claim and a police report against Radcliff, he could get a new roof. *Id.* at 2985. But Mr. Pongratz never filed a vandalism claim or a police report because he "knew that wasn't the truth" and could not "with integrity" do that. *Id.* at 2986.

### 5. Craig and Kay Hinshaw

Cockerill told the NICB that its adjusters did not find any hail damage to the Hinshaw's home. *Id.* at 2601. But, months before Radcliff's employees were even involved, a State Farm adjuster found twenty hail-damaged shingles, hail damage to a bubble well cover and gutters, and interior damage. *Id.* at 2601-02.

An independent contractor, Dan Planker, found enough storm damage to warrant a roof replacement before Radcliff was involved. *Id.* at 2604-05, 2917, 2924. Cockerill told the NICB that after Planker inspected the roof with a State Farm adjuster, Planker agreed that there was no damage to the Hinshaws' roof. *Id.* at 2605. However, Cockerill never spoke with Planker to verify this, *id.*, and Planker did not testify to this at trial, *id.* at 2924. The Hinshaws ultimately filed a vandalism claim under their policy and received a new roof. *Id.* at 2609.

14

## 6. James and Robin Dussinger[7]

State Farm sent an engineer to inspect the Dussingers' roof. *Id.* at 2808. The first report found damage that was not consistent with hail damage. *Id.* at 2809. The report did not use the phrase "intentional mechanical damage" or "vandalism." *Id.* at 2809, 2810. Abell, on behalf of State Farm, requested a second report because one of the homeowner's names was incorrect in the report. *Id.* at 2810. However, in addition to fixing the name, the second report included a new finding that the damage to the roof was "intentional damage, vandalism."[8] *Id.*

## 7. John and Linda Yeager

Before Radcliff was involved with this claim, the Yeagers hired two separate contractors, both of whom found hail damage to their roof. *Id.* at 2611-14. Cockerill admitted that he did not provide these estimates to the NICB.

The Yeagers filed a complaint with the Department of Insurance "question[ing] State Farm's tactics of intimidation" and pointing out that all their neighbors received new roofs. *Id.* at 2615-17. Cockerill never told the NICB about the Yeagers' complaint. *Id.* at 2616-18.

## 8. Roger and Marguerite Carter[9]

---

[7] The Dussingers' date of loss is April 3, 2007.

[8] The engineer who prepared the report testified at trial that Abell called and asked him to "clarify" the cause and origin of the damage, because the first report did not do so. Tr. p. 1187.

[9] It appears that the Carters' date of loss is June 19, 2006.

The Carters hired a roofing contractor who found storm damage to their roof before Radcliff's involvement in this claim. Cockerill did not provide this estimate to the NICB. *Id.* at 2627.

An engineer on behalf of Radcliff issued a report finding storm damage and no vandalism. *Id.* at 2644-45; CPM Ex. 19 (Lee Engineering). Cockerill claimed he never received the report, and this is why he never forwarded it to the NICB. Tr. p. 2645. Radcliff, however, claimed that he gave the report to State Farm. *Id.* at 4128.

Mr. Carter filed a complaint with the Department of Insurance after State Farm opened its investigation into Radcliff and CPM, and Cockerill also did not provide this complaint to the NICB. *Id.* at 2646.

### 9. James and Sandra Shaw

When a State Farm adjuster inspected the Shaws' home in August 2006, he found wind damage to some shingles but no hail damage. Before Radcliff's involvement in this claim, the Shaws hired two contractors, both of whom found hail damage warranting a full roof replacement. Cockerill did not provide these estimates to the NICB. *Id.* at 2658, 2660.

### *G. The NICB Gets Involved*

The NICB is a not-for-profit organization that acts as a liaison between insurers and law enforcement. Burris Dep., p. 10; *see also* Nat'l Ins. Crime Bureau, *Our Story*, https://www.nicb.org/about-nicb/our_story (last visited Apr. 1, 2013). The NICB is also actively involved in insurance legislation. Burris Dep., p. 10. The NICB screens suspicious claims referred by insurers to determine whether they warrant submission to

16

law enforcement. State Farm is a member of the NICB and is one of the NICB's largest financial contributors. *Id.* at 11.

State Farm's SIU refers a claim to the NICB when there are indicators of fraud. Tr. p. 3559. An SIU support person contacts the NICB, and the NICB assigns the claim a referral number. The NICB assigned referral numbers to all ten claims in this case. The NICB became involved in this investigation in either late 2007 or early 2008 when Cockerill, Benz, and others met with Todd Burris, a special agent for the NICB. Burris Dep., p. 16-18; Tr. p. 2458-59. Cockerill and Benz met with Burris again in March or April 2008 to transfer their investigative materials. The NICB requested State Farm's "entire claim file," even if it included evidence that undercut State Farm's suspicions of fraud. Tr. p. 2584; Burris Dep., p. 24-25, 29-30.

Cockerill copied and assembled the materials to give to the NICB, which included the claim logs for each of the ten cases. Cockerill used a marker to redact from the claim logs those entries that he believed were protected by the attorney-client privilege. Radcliff claims that some of those entries were wrongly marked out, such as the entry on the Moll's claim log discussed above. The NICB did not request unredacted copies of the claim logs. There were documents that Cockerill did not provide to the NICB even though State Farm was instructed to send the "entire claim file." *See* Tr. p. 2584 (Cockerill admitting that he did not send the entire claim file to the NICB); Appellant's Br. p. 15-16 (State Farm conceding on appeal that it did not turn over certain documents to the NICB but arguing that these documents were nonetheless referenced in the claim logs). As Radcliff and CPM's attorney demonstrated at oral argument, the jury saw two

stacks of paper at trial: a large stack of paper that consisted of all ten claims files in this case and a much smaller stack of paper that State Farm sent to the NICB. Oral Arg. Video Tr. 3:14-25.

Nevertheless, Benz and Cockerill gave Burris "banker's boxes" containing a "substantial amount of material." Burris Dep., p. 18-19. Benz claimed at trial that State Farm never requested that any criminal charges be brought against Radcliff as a result of its investigation and that he had no expectation of what the NICB would do with the information State Farm provided because the goal was to find the truth. Tr. p. 3552. In response to this claim by Benz, part of a rough draft of a letter addressed to the NICB that Cockerill sent to Benz for review was read aloud to Benz at trial:

> State Farm Fire & Casualty Company alleges that CPM Construction of Indiana LLC and their representatives have conspired together to execute a scheme to commit insurance fraud and is a Racketeer Influenced and Corrupt Organization.
>
> \* \* \* \* \*
>
> Further, evidence is enclosed which demonstrates five different occurrences involving this insurance fraud scheme. State Farm requests that CPM Construction of Indiana and the individuals listed above be named in an indictment for their involvement in a Racketeer Influenced and Corrupt Organization based upon the five predicate felonies referred to above.

*Id.* at 3554-55.[10] When asked if he still wanted to stand behind his statement that the goal of the investigation was not to get Radcliff arrested, Benz said yes, because it was a decision for the NICB to make. *Id.* at 3554, 3555. Benz did deny that the whole investigation was "put together by State Farm to get Mr. Radcliff arrested in order to fix a media problem." *Id.* at 3556.

---

[10] It is unclear whether this letter was ever sent to the NICB.

18

In any event, Burris reviewed the materials supplied by State Farm and decided to send the materials to the IMPD. Burris Dep., p. 19. Burris contacted Detective Tom Hildebrand with the IMPD's Crime Action Team. *Id.* Detective Hildebrand reviewed the file and informed Burris that there was probable cause to discuss the matter with the prosecutor. *Id.* at 22.

*H. Radcliff is Arrested*

After Detective Hildebrand met with the prosecutor, he prepared a probable-cause affidavit. State Farm Ex. 261; CPM Ex. 156. The affidavit alleged, among other things, that there was probable cause, based upon the NICB's investigation, to charge Radcliff with insurance fraud for inflicting intentional mechanical damage to five Marion County homes, a Class C or D felony under Indiana Code section 35-43-5.4.5.[11] Both Burris and Cockerill reviewed the probable-cause affidavit for accuracy. Cockerill believed the affidavit was accurate and forwarded it to Benz for his review. Benz also believed it was accurate. The prosecutor filed the probable-cause affidavit in July 2008

On September 17, 2008, Radcliff was attending arbitration on behalf of a State Farm policyholder. Tr. p. 4070. Radcliff got out of his truck and was walking with one of his employees; the policyholders had parked about fifty yards away. *Id.* A man approached Radcliff and confirmed his name. *Id.* At this point, about six to eight men jumped out with guns drawn and instructed Radcliff to freeze. *Id.* at 4070-71. Radcliff said that while he was being arrested, a State Farm adjuster who was there for the arbitration laughed at him. *Id.* at 4071-72. Radcliff was taken to downtown Indianapolis

---

[11] The homes belonged to Tom and Julie Moll, William Stevens, Trent Hinshaw, Craig and Kay Hinshaw, and James and Robin Dussinger.

to be processed, and he bonded out of jail about five hours later. *Id.* at 4073. As Radcliff was leaving the jail, he was told that media was present, which is when he realized "the severity of what was going on." *Id.* at 4074. Radcliff was charged with fourteen felonies, including insurance fraud, corrupt business influence, criminal mischief, and attempted theft. State Farm Ex. 249-A.

Rinock issued the following public statement to rtv6 within hours of Radcliff's arrest:

> We are cooperating with and assisting the authorities in their investigation. As the nation's largest property and casualty insurance company, State Farm is committed to helping law enforcement in developing and implementing programs that help curb crimes like fraud because it impacts our business and our customers.

Rinock Dep., p. 122-23. Rinock explained that Radcliff's arrest gave State Farm the "opportunity to tell [its] story in a positive light," which assisted in defraying the negative media attention that it had received. *Id.* at 135-37.

Radcliff's arrest was front page news on The Indianapolis Star as well as the Orlando Sentinel, which is where his family lived, and was covered by "every news station" in Indiana. Tr. p. 4078. CNN even covered Radcliff's arrest. *Id.*

The day after Radcliff's arrest, Cockerill spent part of his day forwarding news reports about the arrest. *Id.* at 2852-66. Three days after Radcliff's arrest, Cockerill visited Radcliff's wife's MySpace page and found a picture that someone had posted depicting a stick-figure Radcliff behind bars being raped. *Id.* at 2844-49. Cockerill forwarded the link to Burris, the NICB special agent who had worked on the case, and told him to "enjoy." CPM Ex. 148.

20

Cockerill was later awarded the Investigator of the Year by the International Association of Special Investigation Units for his work on this case. Tr. p. 2866-67. He received $1000 and a trophy. *Id.* at 2867. Benz nominated Cockerill for this award. *Id.*

On April 1, 2009, the prosecutor added a fifteenth count for Class A misdemeanor criminal mischief. State Farm Ex. 249-A. The charging information for this count alleged that Radcliff recklessly, knowingly, or intentionally damaged or defaced the Moll's roof shingles and/or gutters without their consent by making or causing to be made mechanical damage resulting in pecuniary loss of at least $250 but less than $2500. *Id.* That same day, Radcliff and the State entered into an Agreement to Withhold Prosecution. State Farm Ex. 227. According to the Agreement to Withhold Prosecution, Radcliff agreed (1) there was "probable cause for [his] arrest of Criminal Mischief/MA," (2) "this precludes expungement of the arrest record," (3) to "[c]ommit no criminal offense during the next two (2) years"; and (4) to pay fees of $650. *Id.* The day the diversion agreement was filed with the court, the State dismissed the fourteen felonies and the misdemeanor. State Farm Ex. 226.

## *I. The Effect of the Arrest on Radcliff and CPM*

The day after his arrest, Radcliff received word that already-delivered materials were being removed from job sites by suppliers. Tr. p. 4074. ABC Supply, which had been doing business with Radcliff for years, closed his account, telling him that "they can't do business or be associated with a criminal." *Id.* Radcliff's other suppliers quickly followed suit. Allside Supply, Reese Wholesale, Shelter Distributors, and Modern Building Supply all closed Radcliff's accounts within twenty-four hours of his

arrest. *Id.* at 4074-75. The same thing happened in Missouri, where Radcliff had another CPM office.

Radcliff started losing salespeople too. Radcliff's company went from 400 people to just 15 people at the time of trial—15 employees with Radcliff's wife's company, Master Built, but only 1 employee with CPM, Radcliff himself. *Id.* at 4076.

Radcliff tried to speak with his clients in the three states where CPM was located. However, Radcliff's competition quickly began to use his arrest against him. His customers "saw the newspaper articles and they heard the salespeople's pitches about who [he] was[,] that [he's] a criminal and [commits] insurance fraud." *Id.* at 4076-77. Radcliff got phone calls from clients canceling their contracts and demanding the return of their deposits. *Id.* at 4077.

After another hailstorm in central Indiana in 2009, Radcliff was able to initially sign up over 300 customers, but he lost 80% of those customers within 48 hours because competition went around telling them about Radcliff's arrest. *Id.* at 4078. By the beginning of 2009, Radcliff realized that CPM would have to shut its doors. *Id.* at 4079. Ultimately, CPM's Missouri office also had to close because of the negative attention from Radcliff's arrest. *Id.* at 3188-89.

Radcliff tried to escape the effects of the negative attention by having his wife create another roofing company, Master Built. *Id.* at 4083. But Radcliff could not hide from the negative publicity, and Master Built was not doing well either. *Id.*; *see also id.* at 3218-19 (general manager of Master Built testifying that Master Built was doing "poorly" at the time of trial).

Radcliff created a new corporation, XactLink, in an attempt to "get [his] family back up and running financially." *Id.* at 4082. XactLink is a software company that manages construction companies to make them paperless. *Id.* XactLink was owned by a holding company, Fortuna Logistics, and Radcliff is the only person with an interest in Fortuna Logistics. *Id.* At the time of trial, however, XactLink was not producing any income because the software had not been completed. *Id.* at 4082-83.

*J. State Farm Files a Civil Suit against Radcliff and CPM*

Approximately one month after Radcliff was arrested, on October 20, 2008, State Farm filed a complaint against Radcliff and CPM in Judge Nation's court in Hamilton County alleging fraud and racketeering. Appellant's App. p. 47. Specifically, State Farm alleged that Radcliff and CPM had a fraudulent scheme of intentionally damaging homes to simulate hail and wind damage, obtaining powers of attorney from the homeowners, and then submitting false insurance claims. Radcliff and CPM filed a counterclaim against State Farm alleging defamation, abuse of process, and interference with business relationships.

State Farm sought summary judgment on Radcliff and CPM's defamation claim. The trial court denied State Farm's motion for summary judgment, finding that there were genuine issues of material fact that needed to be resolved by a jury. *Id.* at 33-39. Before trial, State Farm filed a motion to exclude the testimony of Radcliff's economic expert, Dr. Bruce Jaffee. State Farm argued that Dr. Jaffee's opinion that Radcliff had lost earnings of $7.5 million had no foundation. The trial court denied State Farm's motion. *Id.* at 2513. Dr. Jaffee later testified at trial without objection from State Farm

23

that Radcliff had $7.5 million in lost earnings. He arrived at this figure by opining that the closure of CPM resulted in Radcliff losing $394,640 a year for 20.5 years, which—after taking into account discounting and increases per year—amounted to a $7.5 million loss. Tr. p. 3634.

### K. The Jury Trial Begins

The jury trial began on May 23, 2011, with a jury of six and two alternates. More than forty witnesses testified over the course of the next forty days. Numerous jury instructions were given, and State Farm did not object to any of them. Oral Arg. Video Tr. at 7:07-10. Radcliff and CPM asked the jury for $30 million—$7.5 million in lost earnings and profits and triple that amount, or $22.5 million, for the emotional and reputational damage that State Farm's actions caused. Tr. p. 4447-49.

On June 29, 2011, the jury returned its verdict. The jury found against State Farm on all of its claims and found in favor of Radcliff and CPM on their defamation counterclaim.[12] The jury awarded Radcliff and CPM $14.5 million, nearly half of what they requested. The trial court entered judgment against State Farm for $14.5 million plus 8% interest, with costs to be paid by State Farm. Appellant's App. p. 2688. State Farm claims that this defamation award "exceeds all prior Indiana defamation verdicts by many multiples" and is one of the largest in United States history. Appellant's Br. p. 57; Oral Arg. Video Tr. at 4:16-18.

---

[12] The jury found against Radcliff and CPM on their counterclaim for interference with a business relationship. Appellant's App. p. 2681D. The verdict form shows that the jury found in favor of Radcliff and CPM on their counterclaim for abuse of process but awarded no damages. *Id.* at 2681E. Citing a different page of the appendix, the jury minutes, State Farm says that the jury decided against Radcliff and CPM on their counterclaim for abuse of process. *Id.* at 2683. In any event, no damages were awarded.

State Farm filed a motion to correct error in which it argued that (1) it was entitled to judgment on the evidence on the defamation claim, (2) it was entitled to a new trial under the "thirteenth juror" rule, and (3) the damage award was excessive. The trial court denied State Farm's motion to correct errors in whole. Appellant's App. p. 45.

State Farm appealed. Documents filed in the appeal include twenty volumes of trial transcripts, more than fifteen volumes of exhibits, twelve volumes of the appellant's appendix, ten claims notebooks, and other materials.

During the briefing stage, State Farm filed a Verified Motion for Limited Remand under Appellate Rule 37 in order to be allowed to file a Trial Rule 60(B) Motion because it had "received a sworn statement leading it to believe that fraud was used to obtain the $14.5 million defamation judgment against State Farm and in favor of [CPM]." On July 13, 2012, the motions panel, in a 2-1 decision, denied State Farm's motion.

**Discussion and Decision**

State Farm raises several issues on appeal. First, State Farm contends that it is entitled to judgment on Radcliff and CPM's defamation counterclaim pursuant to two defenses: the public-interest privilege for crime reporting and statutory immunity. Second, State Farm contends that Radcliff and CPM failed to prove actual malice by clear and convincing evidence. Last, State Farm contends that it is entitled to a new trial on damages, because the trial court erred in admitting Radcliff's expert's testimony, Radcliff and CPM failed to prove proximate cause, and the damages are excessive. But first, we explore defamation law.

**I. Defamation Law**

Radcliff and CPM asserted that State Farm defamed them by making the following communications: (1) sending information to the NICB which stated that Radcliff and/or CPM engaged in criminal conduct and (2) reviewing the accuracy of the probable-cause affidavit. Appellant's App. p. 2647 (Final Instruction No. 16).

Radcliff and CPM's defamation counterclaim against State Farm implicates the First Amendment to the United States Constitution. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times v. Sullivan*, 376 U.S. 254, 269 (1964) (quotation omitted). There is a "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* However, the rights under the First Amendment are not absolute, because they must be weighed against other societal interests, such as the protection of an individual's reputation. *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 451 (Ind. 1999). A defamatory communication is defined as one that tends "to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010) (quotation omitted); *Bandido's*, 712 N.E.2d at 451.

In the landmark decision of *New York Times v. Sullivan*, the United States Supreme Court held that the First and Fourteenth Amendments required a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it

was false. 376 U.S. at 279-80. Three years later, the United States Supreme Court extended the constitutional privilege to defamatory criticism of public figures in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155 (1967). Several years later, in *Gertz v. Robert Welch, Inc.*, the United States Supreme Court determined that "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." 418 U.S. 323, 343 (1974). Thus, the United States Supreme Court concluded that a negligence standard would be imposed for defamation suits brought by private individuals in federal court but left it up to the states to define for themselves the appropriate standard for liability for defamatory statements made about a private individual. *Id.* at 347.

Twenty-five years later in *Journal-Gazette Co. v. Bandido's*, the Indiana Supreme Court declined to adopt the federal negligence standard and instead established "actual malice" as the standard for private-individual plaintiffs in matters of public or general concern. 712 N.E.2d at 452.

## II. Defenses

State Farm contends that it is entitled to judgment on the evidence on Radcliff and CPM's defamation counterclaim pursuant to two defenses, the public-interest privilege for crime reporting and statutory immunity.[13]

---

[13] State Farm also contends that it is entitled to summary judgment. However, because State Farm does not make a separate argument based on the evidence designated at summary judgment, we find that it has waived this issue. *See* Appellees' Br. p. 23 n.9 (Radcliff and CPM arguing that State Farm "failed to develop any appellate argument based on evidence designated during summary judgment."). State Farm responds to Radcliff and CPM's waiver argument in its reply brief, but notably it does not claim that it in fact made a separate argument based on the designated evidence. Appellant's Reply Br. p. 14 n.6.

The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence presented at trial. *Barrix v. Jackson*, 973 N.E.2d 22, 29 (Ind. Ct. App. 2012), *trans. denied*. We use the same standard that governs the trial court when it makes its decision. *Newland Res., LLC v. Branham Corp.*, 918 N.E.2d 763, 770 (Ind. Ct. App. 2009). Judgment on the evidence is proper only where all or some of the issues are not supported by sufficient evidence. *Id.* The court looks only to the evidence and the reasonable inferences drawn most favorable to the nonmoving party, and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case. *Id.*

*A. Public-Interest Privilege for Crime Reporting*

State Farm argues that Cockerill's and Benz's communications with the NICB and the IMPD are protected because of the qualified public-interest privilege for crime reporting.[14]

"A qualified privilege applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he had a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Williams v. Tharp*, 914 N.E.2d 756, 762 (Ind. 2009) (quotation omitted). As a defense to defamation, the qualified privilege operates not to change the actionable quality of the words published, but merely to rebut the inference of malice that is otherwise imputed. *Id.* To merit protection, the burden is on the defendant first "to establish the existence of a privileged

_____

[14] The jury received an instruction on this defense. Appellant's App. p. 2653 (Final Instruction No. 22); Appellees' App. p. 3 (Preliminary Instruction No. 15).

28

occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words." *Id.* (quotation omitted). Then, the plaintiff has the burden of overcoming that privilege by showing that it has been abused. *Id.* When speaking of abuse, "the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which privilege exists." *Id.* (quotation omitted). And unless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury. *Id.*

The privilege implicated in this case relates to the public interest in encouraging private citizens and victims not only to report crime, but also to assist law enforcement with investigating and apprehending individuals who engage in criminal activity. *Id.* That is, the public interest is served by the prompt reporting of suspected criminal activity, even when uncertain. *Id.* at 763. It is well established in Indiana that "communications made to law enforcement to report criminal activity are qualifiedly privileged." *Kelley v. Tanoos*, 865 N.E.2d 593, 600 (Ind. 2007). Our Supreme Court has extended the public-interest privilege to statements made to private citizens, because "[j]ust as statements to law enforcement further a public interest, similar statements made to a private citizen may further the same interest." *Id.* at 601. In the words of our Supreme Court, it "bears stating the obvious" that in a qualified-privilege action, the reporting citizen is necessarily mistaken about what he thought he saw. *Williams*, 914 N.E.2d at 767. Inasmuch as liability for defamation does not exist where statements are true, the privilege exists to protect tipsters from liability for making inaccurate reports. *Id.*

But this privilege is not without limits. *Id.* at 763. A statement may lose its privileged character upon a showing of abuse wherein (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth. *Id.* at 763-64; *see also Brown v. Indianapolis Housing Agency*, 971 N.E.2d 181, 186 (Ind. Ct. App. 2012). Unless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury. *Kelley*, 865 N.E.2d at 601.

State Farm argues that Cockerill's and Benz's communications to the NICB and the IMPD about Radcliff engaging in criminal conduct are precisely the type of communication this privilege is designed to protect. Appellant's Br. p. 30. Radcliff and CPM, on the other hand, argue that State Farm abused the qualified privilege because Cockerill and Benz were primarily motivated by ill will in making the statements. Appellees' Br. p. 30.[15]

The evidence shows that Radcliff was trying to help State Farm policyholders at the very same time that State Farm was receiving negative press for denying claims arising from the April 2006 hailstorm. It was reasonable to assume that Radcliff and CPM were targeted not because of fraudulent activity but rather because of their work on behalf of State Farm clients. This work included Radcliff reporting State Farm to the

---

[15] Radcliff and CPM also argue that State Farm abused the qualified privilege because Cockerill and Benz communicated to the NICB and the IMPD without belief or grounds for belief in the truth. When looking at the evidence most favorable to the non-moving party—Radcliff—there is also sufficient evidence to support the conclusion that Cockerill and Benz communicated to the IMPD and the NICB without belief or grounds for belief in the truth for the reasons set forth in the Statutory Immunity section, *supra*.

Department of Insurance, meeting with rtv6's Rafael Sanchez about State Farm, posting signs in and around Marion County that CPM would fight State Farm claims—which State Farm was upset about—and having the homeowners sign powers of attorney so that CPM could deal directly with State Farm. Although other contractors placed newspaper ads stating that they would not work with homeowners who had State Farm as their insurance, CPM would. And all of this caught the eye of State Farm.

Around February 2007, Rinock, State Farm's media specialist for the Great Lakes Zone, learned that Radcliff was meeting with Rafael Sanchez as part of rtv6's ongoing inquiry into State Farm's practices. CPM Ex. 166. Rinock made a note to herself that there would be an investigation into Radcliff and CPM because there were concerns about the "professional business ethics of this particular group." *Id.* By March 2007, State Farm had decided to go with a more aggressive strategy because its attempts to defray the negative media attention had failed. Importantly, at this point in time, there had not been a single engineering report finding vandalism to a State Farm policyholder's home. That report did not come until August 2007. But by that time, Radcliff and CPM had already been singled out.

Radcliff and CPM's expert, Dr. Kim Saxton, a professor of marketing at Indiana University Kelley School of Business, testified that this was consistent with the well-known crisis communication strategy of "attacking the accuser." Saxton Dep., p. 137-56, 211-12 ("I see that one contractor out of all the contractors in Indianapolis and one insurance . . . company out of all the claims that were paid in this area warranted an arrest. And that person that was arrested, to my knowledge, is a person who raised

31

complaints to the Department of Insurance against State Farm. . . . I don't know that they had a strategy, but I see a desire on their part to be more aggressive. And to be honest with you, there are some things in the e-mails from the [SIU] folks that are gleeful when he is arrested, and that suggests that this was an outcome that they were excited about. In addition, they note that the story made the top half of the paper. The top half of the paper is a prominent position and desirable. So, internally, they are discussing that they got what they wanted.")

Additional evidence of State Farm's ill will is found in the fact that State Farm did not heed the NICB's instructions to turn over its entire claim file, even if that meant including materials that undercut its suspicions of insurance fraud. Instead, State Farm removed materials that showed hail damage—not vandalism—to the homeowners' roofs.

Evidence surrounding Radcliff's arrest also provides evidence of State Farm's ill will. Shortly after Radcliff was arrested, State Farm tried to capitalize on his arrest by issuing the following public statement to rtv6:

> We are cooperating with and assisting the authorities in their investigation. As the nation's largest property and casualty insurance company, State Farm is committed to helping law enforcement in developing and implementing programs that help curb crimes like fraud because it impacts our business and our customers.

Rinock Dep., p. 122-23. Rinock later explained that Radcliff's arrest gave State Farm the opportunity to tell its story in a positive light, which assisted in defraying the negative attention that State Farm had been receiving.

The day after Radcliff's arrest, Cockerill spent part of his day forwarding articles about Radcliff's arrest. Three days after Radcliff's arrest, Cockerill visited Radcliff's

32

wife's MySpace page and found a picture that someone had posted depicting a stick-figure Radcliff behind bars being raped. Tr. p. 2844-49. Cockerill forwarded the link to Burris, the NICB Special Agent who had worked on the case, and told him to "enjoy." CPM Ex. 148.

Based on the above evidence, the trial court properly denied State Farm's motion for judgment on the evidence based on the public-interest privilege for crime reporting because looking to the evidence most favorable to Radcliff there was sufficient evidence to support that Cockerill and Benz were primarily motivated by ill will in making the statements.[16] This question was properly left to the jury, and the jury, having been instructed on this privilege, concluded that State Farm abused it.

### B. Statutory Immunity

State Farm next argues that Cockerill's and Benz's communications with the NICB and the IMPD are protected by statutory immunity, Indiana Code sections 27-2-19-6 and -7, because they were made in good faith.[17]

---

[16] State Farm argues in its reply brief that "[t]here is nothing in *Williams*' holding that a speaker's 'ill-will' constitutes 'abuse of the privilege.'" Appellant's Reply Br. p. 14. This is because in *Williams*, our Supreme Court did not address the ill-will exception to the qualified public-interest privilege for crime reporting. Instead, our Supreme Court addressed only one of the three exceptions:

> Specifically, the plaintiffs do not argue that Tharp [an employee who accused a customer of showing a gun] was primarily motivated by ill will (he had never met the plaintiffs before), or was guilty of excessive publication (he told only a few people at the restaurant and responded to Officer Frolick's investigation), but argue that they designated evidence to create a genuine issue about whether Tharp made his statement "without belief or grounds for belief in its truth."

*Williams*, 914 N.E.2d at 764.

[17] The jury received an instruction on this defense. Appellant's App. p. 2652 (Final Instruction No. 21). As with all instructions, State Farm did not object to the giving of the instruction.

33

A law enforcement agency, an insurer,[18] or a governmental agency that has reason to believe that a claim for insurance proceeds is being or is likely to be presented based upon misrepresentation and with intent to defraud is authorized to speak with any other law enforcement, insurer, or governmental agency without obtaining the claimant's authorization. Ind. Code § 27-2-19-6(a). The grant of immunity is as follows:

> (b) Any:
> > (1) law enforcement agency, insurer, or governmental agency; or
> > (2) agent, employee, or representative of a law enforcement agency, insurer, or governmental agency;
>
> that receives or provides information referred to in this chapter *in good faith* is immune from liability arising from the act of receiving or the act of providing the information.

Ind. Code § 27-2-19-7 (emphasis added).

The IMPD qualifies under the statute because it is a law-enforcement agency. State Farm argues that the NICB also qualifies because it is a "representative" of an insurer.[19] I.C. § 27-2-19-7(b)(2). That is, the NICB is a not-for-profit organization that serves as a liaison between insurers and law enforcement and evaluates suspicious claims referred by insurers to determine whether to forward them to law enforcement.

Assuming but not deciding that the NICB is covered under the statute, the question becomes whether Cockerill and Benz acted in good faith regarding their communications to the NICB and the IMPD. The statute does not define good faith. And there is no case law defining good faith in the context of the statute either. In the context of a qualified

---

[18] An insurer means "a person who transacts a property and casualty insurance business." Ind. Code § 27-2-19-2.

[19] Radcliff and CPM do not challenge whether the NICB qualifies under the statute; rather, they only challenge good faith. *See* Appellees' Br. p. 35-36.

privilege for defamation, however, good faith exists unless the speaker "lacked any grounds for belief as to the truth of the statements." *Dugan*, 929 N.E.2d at 189 ("The designated evidence here clearly establishes that Komorowski's statements were based on an accumulation of several years of careful personal observations and gathering of information from others with first-hand knowledge and that his resulting concerns and opinions were expressed to the security chief in good faith.").

State Farm first argues that it had legitimate grounds to believe that Radcliff and CPM submitted fraudulent insurance claims and therefore engaged in criminal conduct. State Farm offers the following reasons: (1) they received reports from twenty-one adjusters who concluded that Radcliff and CPM had submitted insurance claims for homes with either no hail damage or intentional damage; (2) they received engineering reports from seven different engineers employed by five different engineering firms who concluded that the damage to the homes was man-made; (3) the adjusters and engineers reported similar—if not identical—types of damage; (4) they had eyewitness and physical evidence supporting their beliefs, including a claims representative who said he saw Radcliff bend shingles and a former CPM employee who provided an incriminating email; and (5) their communication to the NICB was part of the SIU's standard protocol for reporting suspicious claims, and they reviewed the probable-cause affidavit at the IMPD's request. *Id.* at 26-29.

Radcliff and CPM respond that the evidence instead shows that Cockerill and Benz lacked grounds for belief in the truth of their statements and instead engaged in an all-out attack designed to take Radcliff out, not because of suspected fraudulent activity,

35

but rather because Radcliff was exacerbating an embarrassing media situation. They argue that Cockerill and Benz utilized "deception, misinformation, intimidation, and omissions to ultimately present an investigation report that was fraudulent, incomplete, fabricated, and in willful violation of express NICB instructions to include all documents related to the claims." Appellees' Br. p. 36.

The record supports Radcliff and CPM. There are multiple examples where State Farm asked engineers and adjusters to issue new reports to clarify that the damage was in fact caused by vandalism. For example, for the Molls' claim, Benz thought that there were some inconsistencies in Roofing Consultants' report, so he consulted State Farm's attorney and then called Roofing Consultants to seek clarification. Tr. p. 3503. The final report concluded that the marks on the Molls' roof were not consistent with hail. State Farm Ex. 49, p. 2-3. There was an entry to the Molls' claim log about Benz contacting Roofing Consultants to clarify its report, but Cockerill marked out this entry before turning over the Molls' claim log to the NICB. Tr. p. 2798-2803. Cockerill told the Molls that their claim would be denied but that they could file a vandalism claim and a police report against Radcliff in order to get a new roof (and preserve their State Farm claims-free discount). As for Trent Hinshaw's claim, State Farm hired an engineer to inspect the roof, and this report did not identify any vandalism. *Id.* at 2816-17. So, State Farm asked Hinshaw if a second engineer from the firm could inspect the roof. The second report found intentional mechanical damage to Hinshaw's roof. *Id.* at 2818. According to Radcliff and CPM's attorney at oral argument, the second report described the damage as "the worst case of vandalism" that the engineer had ever seen. Oral Arg.

Video Tr. 34:18-32. Before the second report was even issued, State Farm instructed Hinshaw to file a vandalism claim against Radcliff. For the Dussingers' claim, Abell, on behalf of State Farm, requested a second report because one of the homeowner's names was incorrect in the first report. Tr. p. 2810. However, in addition to fixing the name, the second report included a new finding that the damage to the roof was "intentional damage, vandalism." *Id.* The first report did not use these words.

There is additional evidence showing that Cockerill and Benz lacked grounds for belief in the truth of their statements. For example, State Farm knew that (1) there was evidence showing hail damage to some of the homes *before* Radcliff and CPM ever got involved in the claims and (2) independent contractors as well as Radcliff and CPM's engineer, Lee Engineering, found hail damage—not vandalism. Although State Farm and Radcliff argue back and forth about what documents State Farm had, there is sufficient evidence in the record to support the conclusion that State Farm withheld considerable evidence from the NICB and in turn the IMPD and that of the thousands of pages sent to the NICB, State Farm chose not to send the very pages that showed hail damage—and not vandalism—to the policyholders' homes.

Based upon our standard of review, looking to the evidence most favorable to Radcliff and CPM, we cannot say that the trial court erred when it denied State Farm's motion for judgment on the evidence on statutory immunity. There is sufficient evidence to show that State Farm did not act in good faith; the jury's verdict should not be disturbed.

State Farm makes one final argument it claims entitles it to statutory immunity. *See* Appellant's Br. p. 28-30. That is, State Farm argues that Cockerill's and Benz's reasons for reporting Radcliff cannot be challenged because Radcliff admitted that probable cause existed for his arrest on Class A misdemeanor criminal mischief and therefore he made a judicial admission.[20]

Radcliff was originally charged with fourteen felony counts. On April 1, 2009, the State amended the charging information to include a fifteenth count of Class A misdemeanor criminal mischief. The new Count 15 alleged that Radcliff recklessly, knowingly, or intentionally damaged or defaced the Molls' roof shingles and/or gutters without their consent by making or causing to be made mechanical damage resulting in pecuniary loss of at least $250 but less than $2500. State Farm Ex. 249-A. Radcliff and the State entered into a diversion agreement in which Radcliff admitted that there was probable cause to arrest him on the newly filed Count 15, Class A misdemeanor criminal mischief, and that his arrest record for this count could not be expunged. State Farm Ex. 227. In exchange, all fifteen charges were dismissed that same day including the new criminal mischief charge. State Farm Ex. 226. State Farm claims that Radcliff's admission of probable cause for his arrest on this count "conclusively establishes Cockerill and Benz acted in good faith because they believed Radcliff had committed insurance fraud and had legitimate grounds for their beliefs." Appellant's Br. p. 30.

Although there appears to be no case law in Indiana on this issue, other states have addressed the existence of probable cause as it relates to a defamation claim which is

---

[20] The jury was instructed that the agreement between Radcliff and the Marion County Prosecutor was considered "a judicial admission. A judicial admission is conclusive upon the party making it." Appellant's App. p. 2660 (Final Instruction No. 29).

based on imputing criminal conduct. Under Kentucky law, the existence of probable cause precludes a plaintiff's claim for defamation. *Shemwell v. Heller*, 2012 WL 1038114, *7 (W.D. Ky. 2012). A plaintiff's admission that probable cause for the crime exists prevents the plaintiff from asserting that the defendant was defamed. *Pennington v. Dollar Tree Stores, Inc.*, 28 Fed. Appx. 482, 489 (6th Cir. 2002); *Alexander v. Harrington*, 2007 WL 2772486, *4 (W.D. Ky. 2007).[21]

State Farm relied on *Broaddus v. Campbell*, 911 S.W.2d 281 (Ky. Ct. App. 1995), in both its brief and at oral argument. Although *Broaddus* involves a claim for malicious prosecution and not defamation, it is nevertheless instructive in this case.

Broaddus was indicted by a grand jury for two counts of theft as a result of testimony from Campbell. The criminal action was later dismissed by an agreement in which Broaddus "stipulated to probable cause for the issuance of the indictment." *Id.* at 282. Broaddus later sued Campbell for malicious prosecution, alleging that Campbell knowingly committed perjury by wrongfully swearing that Broaddus had committed the two theft crimes. The trial court dismissed the complaint.

On appeal, the Kentucky Court of Appeals held that although Broaddus did not plead guilty to the theft charges, he stipulated that there was probable cause for the issuance of the indictment. *Id.* at 284. "This voluntary admission, in our opinion,

---

[21] Under Virginia law, for example, it is well settled that a criminal conviction establishes, without the necessity of other proof, the existence of the element of probable cause to arrest and prosecute, which is a complete defense to an action for defamation. *Brewster v. Woodward & Lothrop, Inc.*, 530 F.2d 1016, 1017 (D.C. Cir. 1976); *Janney v. Arlan's Dept. Store*, 247 F. Supp. 306, 308 (W.D. Va. 1965); *see also Cormier v. Lafayette City-Parish Consol. Gov't*, 2012 WL 4842272, *5 (5th Cir. 2012) ("Because Cormier's conviction and the presence of probable cause defeat his false-arrest and malicious-prosecution claims, his state-law defamation claim also must fail. Accordingly, we reverse the district court's denial of summary judgment on Cormier's state-law claims against Stelly and Martin.").

completely refutes his claim in the instant action that the prosecution was unfounded." *Id.* As for Broaddus' argument that his admission of probable cause was for the protection of the Commonwealth, the Kentucky Court of Appeals responded that the stipulation contained no limitations, and it would have been a simple matter for Broaddus to have structured the agreement to preserve his right to bring a malicious prosecution action against Campbell, but he did not do so. *Id.* Moreover, as Broaddus was aware all along that Campbell lied to the grand jury, he was peculiarly aware of the potential for a malicious prosecution action when he settled his criminal action. *Id.* Accordingly, the Kentucky Court of Appeals held that "[h]aving made no allegation that the agreement was the result of coercion or overreaching, we believe the trial court was compelled to hold that Broaddus was estopped from alleging lack of probable cause." *Id.*

Here, we cannot ignore the reality that Radcliff had been charged with fourteen felony counts—ten Class D felonies and four Class C felonies. As criminal-defense attorney Jennifer Lukemeyer testified, Radcliff faced a substantial amount of time in jail. Tr. p. 4049-50. In return for Radcliff admitting that there was probable cause for a single count of Class A misdemeanor criminal mischief, all of his felony counts *and* the misdemeanor criminal mischief count were dismissed that very day. He spent no time in jail, had no period of probation, and was not required to pay restitution to the Molls. He was required to pay fees to the State of $650. Understandably, Lukemeyer's advice to Radcliff was to "accept" the diversion agreement. *Id.* at 4052.

Unlike *Broaddus*, we find both coercion and overreaching in this case. Radcliff faced *fourteen* Class C and D felonies that covered serious offenses including corrupt

40

business influence and insurance fraud. The felony charges were a direct result of a State Farm investigation which intentionally withheld exculpatory evidence from the authorities. Once the charges were filed, Radcliff's choices were (1) accept a diversion agreement to one count of Class A misdemeanor criminal mischief, which a respected criminal defense attorney urged him to accept and which provided immediate dismissal of all charges or (2) go to trial, pay considerable attorney fees, and face the risk of substantial jail time. He hardly had a choice.

Further, Radcliff argued that the very withholding of exculpatory evidence from the authorities established bad faith on the part of State Farm. What evidence the prosecutor had at the time of the arrest may have been sufficient for probable cause to arrest Radcliff for an offense, but only because State Farm withheld the evidence that exonerated him. So, as far as it goes, Radcliff's admission of probable cause was an admission that the evidence, incomplete as it was at the time of his arrest, was sufficient to establish probable cause that he committed a misdemeanor of criminal mischief. Nothing more or less. This is in stark contrast to the elaborate picture of insurance fraud State Farm was painting. Put differently, probable cause for misdemeanor criminal mischief does not equate to probable cause for insurance fraud and corrupt business influence. To hold otherwise would effectively immunize from defamation someone who alleges arson against a simple trespasser.

### III. Sufficiency of the Evidence to Support Defamation Verdict

41

State Farm contends that Radcliff and CPM failed to prove an indispensable element of their defamation claim—"actual malice"—by clear and convincing evidence.[22]

## A. Standard of Review

The parties dispute the standard of review in their briefs.[23] The source of this dispute is the Indiana Supreme Court's opinion in *Bandido's*, which produced four separate opinions in which three of the justices agreed that the plaintiff Bandido's failed to prove actual malice and therefore reversed the jury's verdict in favor of Bandido's. State Farm argues that pursuant to *Bandido's*, our standard of review is an "independent" and "rigorous" de novo review of the record. Appellant's Br. p. 33. Radcliff and CPM, on the other hand, argue that because they are private-figure plaintiffs—and not public officials or public figures—the conventional standard of review applies. Appellees' Br. p. 21. But regardless, Radcliff and CPM's argument continues, the jury's verdict can be affirmed "under *any* standard of review." *Id.*

In *Bandido's*, the Indiana Supreme Court was confronted with a defamation claim by a Mexican restaurant, Bandido's, against the Fort Wayne Journal-Gazette. Bandido's permit was revoked and the restaurant was closed down after the Allen County Board of Public Health found flies, roaches, and rodents during an inspection. The Fort Wayne Journal-Gazette ran a story that was accurate, but the sub headline inaccurately used the word "rats" instead of "rodents." Bandido's sued the newspaper for defamation, and the

---

[22] State Farm also moved for judgment on the evidence on this point. However, we address this issue only by making an independent examination of the entire record.

[23] At oral argument, Radcliff and CPM's attorney agreed that the standard of review was an independent standard of review.

jury awarded Bandido's $985,000 in damages. Our Supreme Court reversed, finding that Bandido's failed to prove actual malice.

Justice Sullivan authored the lead opinion in *Bandido's*. Examining the United States Supreme Court's decisions on defamation, Justice Sullivan explained that the standard of review depends on the status of the plaintiff. A plaintiff can be categorized in one of three ways: (1) public official; (2) public figure; or (3) private figure. In addition, the plaintiffs can be further categorized based on whether their concerns are public/general or private. The public-figure category has subcategories; the most common subcategory is limited-purpose public figures that "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345; *see also Bandido's*, 712 N.E.2d at 474 (Dickson, J., dissenting). These plaintiffs voluntarily inject themselves or are drawn into a particular public controversy and thereby become a public figure for a limited range of issues. *Gertz*, 418 U.S. at 351. The two basic elements for this type of plaintiff are: (1) the existence of a public controversy and (2) the party's conduct in relationship to the controversy in question. 99 Am. Jur. Proof of Facts 3d 393 § 17 *Proof of Facts Establishing Affirmative Defenses Against a Claim for Defamation* (2008).

In *Bandido's*, the jury was instructed that Bandido's was a limited-purpose public figure and that the statements related to a matter of public interest, 712 N.E.2d at 454 n.10, and Bandido's did not object to this characterization at trial. Accordingly, Justice Sullivan concluded that the standard of review was an independent and searching review

of the record as required by *New York Times*.[24]  *Id.* at 454.   Under this review, appellate courts must exercise independent judgment to ensure that the correct standard was applied—that is, the plaintiff proved by clear and convincing evidence that the defendant acted with actual malice.  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510-11, 514 (1984) ("Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice'"); *N.Y. Times*, 376 N.E.2d at 285 ("We must make an independent examination of the whole record, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." (quotation and citation omitted)).

Although there was discussion among the separate opinions in *Bandido's* about the appropriate standard of review, that discussion was directed toward the standard of review for a private-individual plaintiff.  *See Bandido's*, 712 N.E.2d at 490 (Dickson, J., dissenting) (arguing that Indiana's conventional standard of appellate review applies to private-figure defamation cases subject to the actual-malice requirement) (joined by Boehm, J., and Shepard, C.J., on this point), 454 n.11 (Justice Sullivan noting in the main opinion, joined by Justice Selby, that "Because Bandido's is a public figure . . ., we do not address the appellate standard of review to be employed in reviewing a judgment in a defamation case involving matters of public or general concern and a *private individual*

---

[24] In his dissent, Justice Dickson noted that the United States Supreme Court had not imposed this special standard of review in defamation cases involving private-figure plaintiffs—even in matters of public concern—or in defamation cases involving public officials/figures and private concerns. *Bandido's*, 712 N.E.2d at 480 (Dickson, J., dissenting).  As explained below, this case involves a public figure with a public concern.

*plaintiff*." (emphasis added)). All justices agreed in *Bandido's* that the standard of review for a public-figure plaintiff is an independent standard of review.

We now turn to our case. Unlike *Bandido's*, here there were no final jury instructions labeling Radcliff or CPM as a public official, public figure, or private individual. *See* Appellant's App. p. 2632-76 (final jury instructions). Radcliff and CPM argue that they are private plaintiffs but do not explain why. Appellees' Br. p. 21. At oral argument, Radcliff and CPM's attorney maintained this position.

Whether an individual is a public figure is a question of law for the court to resolve. *Bandido's*, 712 N.E.2d at 454. As our Supreme Court recognized in *Bandido's*, restaurants and other establishments that actively advertise and seek commercial patronage have been routinely held to be public figures, at least for the limited purpose of consumer reporting on their goods and services. *Id.* (citing cases).

Here, it is clear that the matter involved a public controversy. Central Indiana suffered a large hailstorm, and State Farm was accused of failing to pay insurance claims when other insurance companies were paying claims. The issue was playing out on television, before the Department of Insurance, and in a class-action lawsuit. In addition, the evidence shows that Radcliff established CPM, a company of 400 people, to repair storm-damaged homes. Radcliff and CPM actively sought out homeowners who had State Farm insurance, as CPM handed out advertising material in neighborhoods. In addition, Radcliff posted signs in and around Marion County advertising that CPM would fight State Farm insurance claims, set up an interview with rtv6's Rafael Sanchez to discuss State Farm, and complained about State Farm to the Department of Insurance.

45

Accordingly, we find that Radcliff and CPM are limited-purpose public figures. *See Stepnes v. Ritschel*, 663 F.3d 952, 963-64 (8th Cir. 2011) (homebuilder sued television station and reporter for defamation after he was arrested for running an illegal lottery; the court concluded that the homebuilder was a limited-purpose public figure because a public controversy already existed at the time of the television broadcast about his arrest as a result of the homebuilder's well-publicized home-giveaway contest which was alleged to be an illegal lottery), *reh'g denied*. Therefore, the independent standard of review applies to this case.

### B. Actual Malice

In defamation actions brought by public-figure plaintiffs, the *New York Times* standard applies,[25] and the plaintiffs must prove by clear and convincing evidence that the statement was made with "actual malice"[26]—that is, with knowledge that it was false or with reckless disregard of whether it was false. *Butts*, 388 U.S. at 164; *N.Y. Times*, 376 U.S. at 279-80; *Bandido's*, 712 N.E.2d at 456. At oral argument, Radcliff and CPM would not concede that actual malice was required in this case, but they argued that even if it was, they met this high standard.

Actual malice is not an objective standard of reasonableness; rather, it is a subjective standard that requires one challenging the speech to prove by clear and

---

[25] While these principles are most familiar in defamation actions against news media, they apply with equal force in defamation actions against non-media defendants. *In re Atanga*, 636 N.E.2d 1253, 1259 n.1 (Ind. 1994); *see also* Francis M. Dougherty, Annotation, *Defamation: Application of New York Times and Related Standards to Nonmedia Defendants*, 38 A.L.R. 4th 1114, §3(a) (Supp. June 2012) (citing cases where the courts adopted the position that the "actual malice" standard with respect to defamation actions brought by public officers or figures applies to nonmedia defendants).

[26] Actual malice is a term of art used to describe the First Amendment protections for speech injurious to reputation and should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. *Love v. Rehfus*, 946 N.E.2d 1, 14 n.12 (Ind. 2011).

convincing evidence that the speaker "'entertained serious doubts as to the truth of his publication,' or acted with a 'high degree of awareness of [his statement's] probable falsity.'" *Love v. Rehfus*, 946 N.E.2d 1, 14-15 (Ind. 2011) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991)), *reh'g denied*. A speaker is not required to verify facts before speaking unless he has some reason to doubt the veracity of those facts. *Id.* at 15 (citing *N.Y. Times*, 376 U.S. at 286-88). The actual malice standard protects those negligent or careless false statements of fact that are inevitable in free debate, as is required by the United States Constitution. *Id.* (citing *N.Y. Times*, 376 U.S. at 292 n.30). A speaker's state of mind is a subjective fact that may be shown by indirect or circumstantial evidence. *Bandido's*, 712 N.E.2d at 456. While a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, "courts must be careful not to place too much reliance on such factors." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). Nevertheless, "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Id.*

The United States Supreme Court has provided examples of the kind of proof that would likely support a finding of actual malice: (1) the defendant fabricates the publication; (2) the publication is the product of the defendant's imagination; (3) the publication is based wholly on an unverified anonymous telephone call; (4) the communication is so inherently improbable that only a reckless person would have published it; or (5) there are obvious reasons to doubt the veracity of the informant or the

47

accuracy of his reports. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *Tavoulareas v. Piro*, 817 F.2d 762, 790 (D.C. Cir. 1987); *Bandido's*, 712 N.E.2d at 462 n.27.

Here, the jury was instructed that Radcliff and CPM had to prove "by clear and convincing evidence that State Farm knew the communication was false or had serious doubts as to the truth of the communication." Appellant's App. p. 2586 (Final Instruction No. 18); Appellees' App. p. 1 (Preliminary Instruction No. 12). State Farm did not object to the instructions.

### C. Employees at State Farm Responsible for the Publication

State Farm first argues that its state of mind "is determined by the state of mind of the speakers who published the alleged defamatory communication, not others associated with the investigation." Appellant's Br. p. 35. Therefore, State Farm's argument continues, because Benz and Cockerill were the only "speakers," "the actual malice inquiry necessarily focuses *solely* on their state of mind." *Id.* (emphasis added). Radcliff and CPM argue that we can look to others at State Farm, such as Fritze, Rinock, Farina, and Abell.

State Farm's argument ignores the unchallenged jury instructions which speak in terms of State Farm, not just Benz and Cockerill. For example, Final Instructions No. 19 and 31 state:

> In deciding whether State Farm knew the communication was false or had serious doubts as to the truth of the communications, you may consider *State Farm's attitude or ill will toward Joseph Radcliff and/or CPM*.
>
> A corporation acts through its agents.
> If, within the scope of his, her, or its authority, a corporation's agent wrongfully acts or fails to act, the corporation is liable for that action or inaction.

48

Appellant's App. p. 2650, 2662 (emphasis added); *see also* Appellees' App. p. 2 (Preliminary Instruction No. 13).

In addition, Benz and Cockerill were not operating in a vacuum. Their motives and state of minds were influenced and informed by what was occurring at State Farm at the time, which we know from the volume of emails that were being written at the time. All of these communications were relevant to the state of minds of Benz and Cockerill, were not objected to by State Farm at trial, and thus we will consider them to the extent they may have impacted Benz's and Cockerill's motives.

*D. Independent Review of the Evidence*

In employing our independent review, we consider the factual record in full to determine whether Radcliff and CPM proved, by clear and convincing evidence, that Benz's and Cockerill's statements were made with actual malice—that is, with knowledge that they were false or with reckless disregard of whether they were false. In addition, we review credibility determinations under the clearly erroneous standard because the trier of fact had the opportunity to observe the demeanor of the witnesses. *Connaughton*, 491 U.S. at 688; *Bose*, 466 U.S. at 499-500.

The record shows that State Farm knew that (1) there was evidence showing hail damage to some of the homes *before* Radcliff and CPM ever got involved in the claims and (2) independent contractors as well as Radcliff and CPM's engineer, Lee Engineering, found hail damage—not vandalism. Nevertheless, State Farm withheld this exculpatory evidence from the NICB—and thus the IMPD and the prosecutor's office— despite the fact that State Farm had been instructed to provide its "entire claim file" to the

NICB.  As Radcliff and CPM's attorney demonstrated at oral argument, the jury saw two stacks of paper at trial: a large stack of paper that consisted of all ten claims files in this case and a much smaller stack of paper that State Farm sent to the NICB.  Oral Arg. Video Tr. 3:14-25.

State Farm also tried to influence some of the homeowners to file vandalism claims again Radcliff.  For example, State Farm asked Mr. Pongratz to file a vandalism claim against Radcliff, but he refused to file a vandalism claim against Radcliff because he could not do so with integrity.  *See Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind. App. 548, 372 N.E.2d 1211, 1222 (1978) ("We are of the belief that where, as here, there is evidence of attempts by reporters to obtain false statements concerning a plaintiff, such evidence may indicate a lack of good faith as well as an attitude disinclined toward the truth and permits an inference of intent to harm thorough falsehood  . . . ." (citations omitted)).

Finally, these events were occurring when State Farm was under intense public scrutiny for its claims handling following the April 2006 hailstorm.  Policyholders filed complaints with the Department of Insurance, a class-action lawsuit was filed, and Rafael Sanchez televised reports on rtv6.  When other contractors said they would not work with State Farm, Radcliff posted signs in and around Marion County stating that CPM would fight State Farm.  Radcliff and CPM were singled out before there was even an engineering report identifying intentional damage to a State Farm policyholder's home. As Dr. Saxton testified at trial, singling out Radcliff was consistent with the well-known

50

crisis communication strategy of "attacking the accuser." Saxton Dep., p. 137-56, 211-12.

Despite this evidence, State Farm argues that Radcliff and CPM "failed to prove by clear and convincing evidence that Benz and Cockerill believed Radcliff had **not** committed insurance fraud but communicated he had anyway." Appellant's Br. p. 36. Instead, State Farm asserts that the record establishes that Benz and Cockerill sincerely believed that Radcliff and CPM had committed insurance fraud based on the substantial evidence they received as a result of the investigation from a variety of reliable, independent, and credible sources. State Farm relies on the following evidence. Two adjusters saw Radcliff bend shingles on the Molls' roof. Three former CPM employees told Cockerill that Radcliff trained his salespeople to intentionally damage roofs to simulate hail damage. These former employees also told Cockerill that Radcliff had sent them a text message that they should stop dime spinning because State Farm was looking for it. In addition, twenty-one State Farm adjusters reported possible man-made damage, and State Farm hired engineers to inspect all ten homes. Cockerill and Benz then received ten reports from seven engineers in five different engineering firms concluding that the damage was largely man-made. State Farm argues that this evidence supports the sincerity of Cockerill's and Benz's subjective beliefs and precludes any finding of clear and convincing evidence of actual malice.

As for the two State Farm adjusters who allegedly saw Radcliff bend the Molls' shingles, they point to a photograph in the claims file as proof, but Radcliff says it is not his hand in the photo. Moreover, Mrs. Moll testified at trial that she saw State Farm's

51

engineer bend back ten to fifteen of her shingles. Tr. p. 3029-30. This was the same engineer that issued the first report that Benz thought contained some inconsistencies. So, Benz consulted State Farm's attorney and then called the engineer from Roofing Consultants to seek clarification. The final report concluded that the marks on the Molls' roof were not consistent with hail. There was an entry to the Molls' claim log about Benz contacting the engineer to clarify the report, but Cockerill marked it out before turning over the claim log to the NICB. Cockerill and Benz told the Molls that their hail claim was denied but that they could file a vandalism claim and a police report against Radcliff in order to receive a new roof. Cockerill added that their State Farm claims-free discount would be preserved this way. The Molls declined the free roof because they never saw anyone associated with CPM intentionally damage their property.

As for the three former CPM employees, only one of them testified at trial for the jury to assess their credibility; this was Buzz Walters, and he testified by video deposition. As was discussed at oral argument, Walters had credibility issues. Credibility determinations are reviewed under the clearly erroneous standard because the trier of fact had the opportunity to observe the demeanor of the witnesses. State Farm makes no specific argument regarding Walters.

State Farm relied on the text message as a key piece of evidence at trial. But the text has credibility issues. First, the text produced at trial was not from Radcliff's phone. Rather, it was from Cockerill's phone, and it had been forwarded numerous times from other phone numbers, none of them proven to be Radcliff's. Second, the text was in two parts even though Cockerill said the original text came as one message.

As for the reports from the engineers, the record on this point is not as innocuous as State Farm would like us to believe. As for Trent Hinshaw's claim, State Farm hired an engineer to inspect the roof, and this report did not identify any vandalism. *Id.* at 2816-17. So, State Farm asked Hinshaw if a second engineer from the firm could inspect the roof. The second report found intentional mechanical damage to Hinshaw's roof. *Id.* at 2818. According to Radcliff and CPM's attorney at oral argument, the second report described the damage as "the worst case of vandalism" the engineer had ever seen. Oral Arg. Video Tr. 34:18-32. Before the second report was even issued, State Farm instructed Hinshaw to file a vandalism claim against Radcliff. For the Dussingers' claim, Abell, on behalf of State Farm, requested a second report because one of the homeowner's names was incorrect in the first report. Tr. p. 2810. However, in addition to fixing the name, the second report included a new finding that the damage to the roof was "intentional damage, vandalism." *Id.* The first report did not use these words.

We conclude, after our independent review, that Radcliff and CPM proved by clear and convincing evidence that Benz and Cockerill made the defamatory statements with knowledge that they were false or with reckless disregard of whether they were false.

### IV. Damages

As the final issue, State Farm contends that it is entitled to a new trial on damages. State Farm argues that the trial court erred in admitting Radcliff's expert's testimony, Radcliff and CPM failed to prove proximate cause, and the damages are excessive.

53

A jury determination of damages is entitled to great deference when challenged on appeal. *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001). Because damages are particularly a jury determination, appellate courts will not substitute their idea of a proper damage award for that of the jury. *Id.* Instead, the court will look only to the evidence and inferences therefrom that support the jury's verdict. *Id.* We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. *Id.* Thus, if there is any evidence in the record that supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed. *Id.* In addition, "[o]ur inability to look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence." *Id.* (quotation omitted). We will vacate an award of damages only when it is not rationally related and "so great as to clearly indicate that the jury was motivated by prejudice, passion, partiality, corruption, or that it considered an improper element." *Glasscock v. Corliss*, 823 N.E.2d 748, 757 (Ind. Ct. App. 2005), *reh'g denied*, *trans. denied*.

We first point out that State Farm's statements were defamatory per se because they imputed criminal conduct and misconduct in Radcliff's profession. *See Kelley*, 865 N.E.2d at 596. In an action for defamation per se, the plaintiff is entitled to presumed damages as a natural and probable consequence of the per se defamation. *Id.* at 597. The jury may presume damages because "the law presumes the plaintiff's reputation has been damaged, and the jury may award a substantial sum for this presumed harm, even without proof of actual harm." *Glasscock*, 823 N.E.2d at 757. In addition, upon proper proof, the

plaintiff is entitled to special damages, or financial damages arising as a consequence of the defamation. *Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223, 1230 (Ind. Ct. App. 2005), *reh'g denied*.

In this case, Final Instruction No. 18 covered damages:

> If you find that Joseph Radcliff has proved that State Farm committed defamation, the law presumes that Joseph Radcliff has been damaged due to the nature of the statements made, and you may award such presumed damages. These may include reasonable compensation for harm to Joseph Radcliff's reputation.
> There is no definite standard or method of calculation to decide reasonable compensation for presumed damages. Joseph Radcliff is not required to present evidence of actual harm, or the opinion of any witness as to the amount of reasonable compensation. Any award for presumed damages must be just and reasonable.
> In addition to presumed damages, you must also award money that will fairly compensate Joseph Radcliff for other proven damages caused by State Farm's communication, including, but not limited to:
> 1. personal humiliation;
> 2. mental anguish and suffering;
> 3. physical harm; and
> 4. financial harm, if any, such as loss of business or income.
> Joseph Radcliff must prove by the greater weight of the evidence that he suffered these other damages.

Appellant's App. p. 2649.

During closing arguments, Radcliff and CPM asked the jury for $30 million—$7.5 million in special damages and $22.5 million in presumed damages. Tr. p. 4447-49. The jury awarded them $14.5 million but did not break down its award into special damages or presumed damages.

### A. Admissibility of Testimony from Radcliff's Expert, Dr. Bruce Jaffee

State Farm first argues that Radcliff's "sole basis" for claiming special damages was that the defamation caused him financial harm, such as loss of business or income.

Appellant's Br. p. 49; Appellant's App. p. 2649 (Final Instruction No. 18). We disagree with State Farm on this point as Final Instruction 18 defines special damages not only as financial harm caused by State Farm's actions but as personal humiliation, mental anguish, and suffering.

Nonetheless, continuing its argument, State Farm says the special damages were "solely premised" upon Radcliff's expert Dr. Jaffee's calculation of lost earnings for CPM. Appellant's Br. p. 50. Dr. Jaffee, a respected professor at Indiana University Kelley School of Business and an economist, determined Radcliff's economic loss at $7.5 million. State Farm, however, asserts that the trial court erred in admitting Dr. Jaffee's testimony because his opinion "lacked any indicia of reliability which misled the jury into artificially inflating Radcliff's damages." *Id.* at 51.

Generally, a party must object to evidence when it is offered into the record. *Perez v. Bakel*, 862 N.E.2d 289, 295 (Ind. Ct. App. 2007). The failure to timely object waives the right to have the evidence excluded at trial and the right on appeal to assert the admission of evidence as erroneous. *Id.* By failing to timely object, the party is, in effect, acquiescing in the admission of evidence. *Id.* In addition, the filing of a motion in limine alone does not preserve the issue for appeal. *Id.* It is well settled that in order to preserve error in the denial of a pre-trial motion in limine, the appealing party must object to the admission of the evidence when it is offered. *Id.*

On May 20, 2011, which was the Friday before trial started, State Farm filed a Motion to Exclude Expert Testimony, arguing that Indiana Evidence Rule 702 required the exclusion of Dr. Jaffee as an expert witness because he was not qualified to testify as

to damages. Appellant's App. p. 1784-95. Following arguments made by the parties outside the presence of the jury, the trial court denied the motion on June 13, 2011. *Id.* at 2513-14 (written order); Tr. p. 2727 (oral ruling). Dr. Jaffee was then called to testify nine days later. Tr. p. 3600-70. State Farm did not object when Dr. Jaffee took the stand or testified.[27] Because State Farm did not object when Dr. Jaffee testified, it acquiesced in the admission of his opinion and the issue is waived.[28]

### B. Proximate Cause

State Farm next argues that Radcliff and CPM failed to present evidence that State Farm proximately caused lost profits and earnings. "A plaintiff pleading special damages due to defamation, whether per quod or per se, must plead and demonstrate that the special damages were incurred as a natural and proximate consequence of the wrongful act." *N. Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 304 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. State Farm asserts that Radcliff and CPM's other expert—Dr. Saxton—did not testify as to causation and Radcliff's testimony was not sufficient either because it established only "a short-term disruption in his relationships with suppliers, customers and employees following his arrest (a generous description of his testimony)." Appellant's Reply Br. p. 26.

Dr. Saxton was retained to testify as to the impact that Radcliff's arrest had on his "business prospects for the future." Saxton Dep., p. 69. Her theory was that the media

---

[27] State Farm argues that it did object; however, the record cite provided is to the June 13 hearing, not to Dr. Jaffee's testimony at trial. *See* Appellant's Reply Br. p. 24 n.10.

[28] Nevertheless, we find Dr. Jaffee's testimony to be based on reliable principles. Further, State Farm vigorously cross examined Dr. Jaffee and presented its own expert testimony to contest the assumptions underlying Dr. Jaffee's opinion and the opinion itself. The jury was free to weigh this evidence in reaching its verdict.

attention "did irreparable harm to Joe Radcliff." *Id.* at 70-71. When she did her first "Google" search on Radcliff eighteen months after his arrest, her first thoughts were, "I don't see how this person can be in business anymore." *Id.* at 92. Dr. Saxton said that the articles on the internet created "a very negative situation for him" because "the lead issues that get discussed are, first of all, his arrest, and then other things related to the idea of him ripping people off or there being complaints." *Id.* at 165-66. Dr. Saxton emphasized that "[t]he challenge with the internet is that once something is on the internet, it's virtually impossible to get rid of it." *Id.* at 176. She concluded that his reputation was in a "virtually unrecoverable place now" and he could "do nothing to get out from under that." *Id.* at 182. She testified in detail about Google's algorithm and how articles show up on the critical first page of results.

Despite this testimony, State Farm argues that Dr. Saxton's testimony does not establish causation because she said that she was not retained to testify whether Radcliff's difficulty would cause him monetary damages. *Id.* at 185-86. But the reasonable inference from Dr. Saxton's testimony is that the internet articles on Radcliff, which were still accessible years later, will affect whom consumers choose to hire. But even assuming Dr. Saxton's testimony is not enough to establish causation, Radcliff's testimony is sufficient. Radcliff testified in detail that his arrest and the ensuing publicity—including the front page of The Indianapolis Star, local news media, and CNN—caused CPM to shut down.

*C. Excessive Verdict*

Finally, State Farm argues that the verdict in this case is excessive. Citing other Indiana cases that had $1 million and less verdicts, State Farm claims that the $14.5 verdict in this case "exceeds all prior Indiana defamation verdicts by many multiples" and "can only be explained by passion, prejudice or the desire to punish an insurance company given the evidence presented." Appellant's Br. p. 57-58. State Farm cites *Ritter v. Stanton*, 745 N.E.2d 828, 849 (Ind. Ct. App. 2001), *trans. denied*, in support of the position that some type of comparative analysis may, under certain circumstances, be necessary to evaluate particular types of damages or to determine whether the size of a particular verdict indicates jury passion or prejudice. However, in *Ritter*, we went on to say that "to do so would be a significant departure from Indiana's historical regard of the uniqueness of every tort claim and the belief that compensatory damage assessments should be individualized and within the discretion of the factfinder." *Id.* And as we more recently explained:

> In *Ritter*, we cautioned against the use of a comparability analysis to determine compensatory damage claims. More importantly, we noted that historically, our courts have always expressed disfavor in evaluating cases other than on their own merits. Clearly, identical injuries may have radically different effects on different plaintiffs. Because we lack the ability to attach price tags to given functions and talents, the translation of social wrongs into dollars and cents is problematic at best.
>
> * * * * *
>
> While it may be tempting to engage in a comparative analysis to aid us in the difficult task of evaluating the award at issue in this case, to do so would be a significant departure from Indiana's historical regard for the uniqueness of every tort claim and the belief that compensatory damage assessments should be individualized and within the province of the factfinder.

*Weinberger v. Boyer*, 956 N.E.2d 1095, 1114 (Ind. Ct. App. 2011) (citations and quotations omitted), *trans. denied*. We will not engage in a comparative analysis in this case.

Here, the jury heard testimony of a man whose whole world—professionally and personally—was destroyed by State Farm's accusations and the accusations' role in his arrest, and it heard from Dr. Jaffee, who testified that Radcliff had $7.5 million in lost earnings, and Dr. Saxton, who explained that Radcliff's reputation was in a "virtually unrecoverable" place. The jury's damage award does not punish State Farm; rather, it attempts to compensate Radcliff for the longstanding consequences it caused on the only profession that Radcliff ever knew. Accordingly, the $14.5 million damage award is not excessive.

## V. State Farm's Claim for Alternate Relief

State Farm makes a request for alternative relief in its reply brief. Appellant's Reply Br. p. 28. Because State Farm makes this request for the first time in its reply brief, the issue is waived. *See* Ind. Appellate Rule 46(C).

Waiver notwithstanding, State Farm asks us to overrule the motions panel's decision and grant its Verified Motion for Limited Remand under Appellate Rule 37. State Farm argues that its motion presented compelling evidence of fraud on the court and this case should be remanded under *Logal v. Cruse*, 267 Ind. 83, 368 N.E.2d 235 (1977). That is, State Farm claims that there is newly discovered evidence from a former CPM employee, Myisha Richards, alleging again that Radcliff committed fraud—this time, they claim, on the court.

60

The record shows, however, that State Farm was scheduled to depose Richards in November 2009, but the deposition was canceled and never rescheduled. In addition, Richards contacted State Farm about the alleged fraud before State Farm filed its motion to correct errors, yet State Farm did not include this information in its motion to correct errors. Based on these facts, we will not overrule the motions panel's ruling. *See In re Estate of Eguia*, 917 N.E.2d 166, 169 (Ind. Ct. App. 2009) (noting that we are reluctant to overrule orders decided by the motions panel).

Affirmed.

BARNES, J., and CRONE, J., concur.